Electronically Filed
Intermediate Court of Appeals
CAAP-18-0000781
22-NOV-2019
07:53 AM

NO. CAAP-18-0000781


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
STACY EDWARD HARDOBY aka STACY EDWARD CAUSEY,
Defendant-Appellant,


APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(Case No. 2CPC-17-0000693(4))


SUMMARY DISPOSITION ORDER
(By:  Fujise, Presiding Judge, Leonard and Hiraoka, JJ.)

Defendant-Appellant Stacy Edward Hardoby, also known as Stacy Edward Causey, (**Hardoby**) was convicted by a jury of first degree unauthorized entry into a motor vehicle and felony abuse of a family or household member.  He appeals from the judgment (**Judgment**) entered by the Circuit Court of the Second Circuit[1] on September 14, 2018.  Hardoby claims that the circuit court erred by (a) not allowing him to call the State's medical expert witness a "hired gun" during closing argument, and (b) failing to instruct the jury on merger of offenses.  For the reasons explained below, we affirm the Judgment.

**I.**

Hardoby was charged by information and complaint with first degree unauthorized entry into a motor vehicle and felony

---

[1]     The Honorable Richard T. Bissen, Jr. presided.

abuse of family or household member because of an incident that happened on September 5, 2017.

Jury trial began on June 18, 2018. The complaining witness (**CW**) testified first. She had been dating Hardoby for eight years. He is the father of their 3-year-old son. On the afternoon of September 5, 2017, CW and Hardoby were "hanging out" at the beach. They started arguing. CW thought Hardoby was agitated about something that happened while they were separated. She drove to Foodland (a supermarket) to buy cigarettes. Hardoby called and said he wanted to talk. CW saw Hardoby in the Foodland parking lot when she was coming out of the store. CW got into her car. Hardoby stayed outside the car. They talked through the open driver's door. He was asking her questions. CW closed the door because she wanted to leave. Hardoby called her a liar. He reached into the car and tried to choke her with a headlock but it was not working, so he choked her with his hands. She had difficulty breathing. She was afraid. She was strangled for ten or fifteen seconds. Hardoby punched the left side of her face. Then he left.

CW called 911. A police officer met her in the parking lot. She showed him her injuries. CW identified State's exhibits 1 through 5 as being photographs showing the way she looked that evening in the Foodland parking lot. CW described a bruise on her neck and a scratch under her chin that she said happened when Hardoby strangled her.

Police officer Murphy Aquino testified that he was assigned to respond to an incident in the Foodland parking lot at about 7:41 p.m. He found CW seated inside her car. She appeared to have been crying; her face was flushed and Officer Aquino saw tears. The area around CW's collar bone and the bottom of her neck were red. There were red finger marks on her neck. There was a vertical scratch under CW's chin towards her neck. CW pointed to a spot on her throat where she said she felt pain. Officer Aquino did not notice petechiae, which he described as "red dots in the white part of the eye that is caused after a person . . . has been restricted of breathing by strangulation."

2

The State's last witness was William Kepler, a physician. The circuit court qualified him as an expert in the fields of general medical knowledge as well as signs and symptoms of strangulation. He explained that strangulation is "impeding air flow to the lungs or impeding blood flow to the brain by external pressure on the neck." More than half of the time during strangulation no mark is left on the person being strangled, but common signs include scratch marks and bruises, and "racoon eyes," or petechiae, which are "tiny dots . . . under the skin" that "could be confused with sunburn." He did not examine CW, but was shown a photograph of CW in evidence. He testified:

> THE WITNESS: Well, ah, I think it's very likely that there are a lot of petechaie [sic] here. In tiny little spots here and here, here, here. All these tiny little spots are very likely to be petechiae. They're not the -- the resolution is not very good. But I actually believe that that is what they are.
>
> Notice that there's a redness around the entire eyes and then there's sparing of the redness on the eyelids. Is that evidence to you folks?
>
> And that looks like to me, again, the same, ah, anatomical physical process that happens when the, ah, petechaie [sic] are formed.
>
> I can't see inside her eyes, but often you can see petechaie [sic] in there as well. I believe those, essentially, that is.
>
> Q.    Thank you, Dr. Kepler. . . . And petechia [sic] again this is correct, that's caused by, ah, lack of blood flow?
>
> A.    Well, it's caused by increased blood flow. It's caused by increased pressure, cut off the flow out of the skull or out of the base, and increased blood pressure occurs inside the vessels and then they leak out the capillaries.

On cross-examination by Hardoby's attorney, Dr. Kepler admitted that he was being paid by the State and had met with the prosecutor, but not with Hardoby or defense counsel. He agreed that petechiae "shows up a lot more" in the eyeballs, and did not appear to be present in the photograph of CW, but clarified that

3

"you need to pull down the lids and look at the lids themselves and other areas there."

The State rested. Hardoby moved for judgment of acquittal. The circuit court denied the motion.[2] Hardoby was the only witness called by the defense. He agreed that he and CW were talking in the Foodland parking lot, but he denied reaching into CW's car, laying his hands on her, or punching her. They decided to break up. He told her he was going to seek sole custody of their child. Then he left. On cross-examination he begrudgingly admitted that he thought CW had cheated on him in the past, but denied being upset, jealous, or angry about it. He eventually admitted that he and CW had an argument "about past infidelities."

During closing, the defense argued that CW made up a story about Hardoby strangling her because she did not want to lose custody of their son:

> Do not underestimate the lengths a person will go to over custody of their kid. [CW] lied to police. She got up here and she lied to you all. How do you know that [CW] lied?
>
> . . . .
>
> Do not under estimate [sic] the lengths that a person will go if pushed to keep custody of their child. That's what she came in here today and yesterday to do. She needed to make sure that she was going to have custody of her child.
>
> . . . .
>
> So that's what happened that day. They broke up. And they broke up. [Hardoby] was sad. [Hardoby] told [CW] that he was taking custody of his son. That's when [CW] had a decision to make. She's using that decision to make sure she has custody of her child.
>
> . . . .
>
> Do not underestimate the lengths that a person will go in order to keep custody of their child. The only logical conclusion in this case is that Mr. Hardoby is not guilty.

---

[2] Hardoby has not appealed from the denial of his motion for judgment of acquittal.

The jury found Hardoby guilty as charged. This appeal followed.

## II.

**A.** **The circuit court did not abuse its discretion by precluding the defense from using the phrase "hired gun" during closing argument.**

A trial judge has broad discretion to control the scope of closing argument. State v. Nofoa, 135 Hawai'i 220, 227, 349 P.3d 327, 334 (2015). An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant. Id. at 228, 349 P.3d at 335.

Before closing arguments were given, the State made an oral motion to preclude Hardoby from referring to Dr. Kepler as a "hired gun."[3] Hardoby argued:

> THE COURT: Were you intending to do so?
>
> [DEFENSE COUNSEL]: Potentially at during closing argument, ah, of using the term hired gun. Um, I think it's well within the right of the -- of the defense to label a person in this case that we think is, um, there has been evidence shown. Ah, he was brought here by the State. He was only interviewed by the State. Only discussions have ever come with the State.
>
> THE COURT: Is that because the defense was not given his name or notice --
>
> [DEFENSE COUNSEL]: That's not true. We were given --
>
> THE COURT: -- or is that because defense chose not to question him?
>
> [DEFENSE COUNSEL]: Fair enough. Um, does defense --
>
> THE COURT: No, I'm just saying you -- you characterize whereas if he did not make himself available or refused to talk to the defense. Is that what happened?
>
> [DEFENSE COUNSEL]: No.
>
> THE COURT: Okay. Go ahead.

---

[3] Neither the State nor Hardoby defined exactly what the phrase "hired gun" meant. The Merriam-Webster dictionary defines the noun as "an expert hired to do a specific and often ethically dubious job." Hired gun, Merriam-Webster, https://www.merriam-webster.com/dictionary/hired%20gun (Last visited Nov. 19, 2019).

[DEFENSE COUNSEL]: That is definitely not the case. Ah, just with the -- the amount of cases that I have, it's just very difficult to be able to --

THE COURT: Oh, no, I'm not blaming you. I'm just asking if he was made available or if you were surprised by him?

[DEFENSE COUNSEL]: Not at all. Um, the testimony that I feel then came out is he was definitely, um, explaining things away in favor of the State. . . .

. . . .

[DEFENSE COUNSEL]: . . . Um, and then there's also, like I said, the pronoun use of she. Maybe it's commonly used in his, I don't know. But again, I felt that there is --

THE COURT: But this case did involve a she.

[DEFENSE COUNSEL]: But he didn't know that. Unless he did know that. So I'm just saying I think it's well within defense's right to use hired gun --

THE COURT: Yeah, I'm not allowing it.

[DEFENSE COUNSEL]: Okay.

THE COURT: No, you can talk about who hired him.

[DEFENSE COUNSEL]: Sure.

THE COURT: And, you know, who called him and all that. But the term hired gun, yeah, I'm not going to let you use that.

. . . .

THE COURT: And you're free to argue who called him and however you want to characterize his testimony. Um, but the specific term, hired gun, I am going to sustain the State's -- well, probably an objection. I mean grant the State's motion in limine.

Hardoby's closing made the following arguments about Dr. Kepler:

So what did the State do next? They brought in Dr. Kepler. Dr. Kepler who is the long time doctor of the community around here. Many of you have known or interact. Maybe just heard of his name in the past.

Dr. Kepler came in here to fix a weak and broken case. What did Dr. Kepler have to say? Nothing. Nothing related to this case. He never examined [CW]. He doesn't know anything about her.

We don't trust the termite report done by an expert [who] never see [sic] the house. How were we going to trust a doctor who never sees a patient?

> Yes, he looks at [CW] and he says, oh, there might be petechaie [sic] from a photograph.  And he says that it's a -- appears to be right over here.  Petechaie [sic] or beauty spots?  I mean you're looking at [CW].  This needs to be beyond a reasonable doubt.  This doesn't need to be a doctor guessing at a photo.  This needs to be solid evidence.
>
> And what did Officer Aquino tell you?  I saw no petechaie [sic].  The officer on scene.  Face to face with [CW] does not see it.  Dr. Kepler even has to point that out in this case there's nothing inside of her eyes.  And all the blood vessels inside of a person's eyes.  None of that has anything to do with it.  Petechaie [sic] or beauty spots?  Petechaie [sic] or sunburn?  This is clearly sunburn.
>
> Now, it really came to asking Dr. Kepler a very specific question.  Would you give a diagnosis to a person that you never met?  A professional diagnosis.  Unequivocally he said no.  That is not what he would do.  So, State just paid for him to be here to try to fix a broken case.
>
> Dr. Kepler's testimony was based solely on hypotheticals.  Ladies and gentlemen, this is not a case of hypotheticals.  That is not what you are here to do.  You are here to judge facts and facts alone.

Hardoby's defense counsel was able to make a strong argument about Dr. Kepler's role in the case without using the term "hired gun."  The circuit court did not abuse its discretion in precluding the defense's use of the term in closing argument.

### B.  The circuit court did not err in refusing to give a merger instruction.

> The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.  Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. In other words, error is not to be viewed in isolation and considered purely in the abstract.

State v. Matuu, 144 Hawaiʻi 510, 516, 445 P.3d 91, 97 (2019) (citations omitted).

Hardoby requested one jury instruction and one special interrogatory on the issue of merger of offenses.  The requested jury instruction read:

> If and only if you find the Defendant, Stacy E. Hardoby, guilty of Counts 1 and 2, then you must next

7

determine if the offenses were committed separately. Offenses are committed separately and do not merge only if the prosecution has not proven beyond a reasonable doubt that (1) the offenses were part of a continuing and uninterrupted course of conduct and (2) the Defendant had one intention, one general impulse, and one plan to commit both offenses.

You must answer the following questions on a special interrogatory that will [be] provided to you:

(1)  Did the prosecution prove beyond a reasonable doubt that the Defendant did not commit the offense of Unauthorized Entry into a Motor Vehicle in the First Degree in Count 1 and Abuse of Family and Household Member in Count 2 as part of a continuing and uninterrupted course of conduct?

(2)  Did the prosecution prove beyond a reasonable doubt that the Defendant committed the offense of Unauthorized Entry into a Motor Vehicle in the First Degree in Count 1 and Abuse of a Family and Household Member in Count 2 with separate and distinct intents, rather than acting with one intention, one general impulse, and one plan to commit both offenses?

The requested interrogatory read:

You must answer the following questions if and only if you have unanimously found the guilty [sic] of any offense in Count 1 and Count 2.  Your answers to these questions must be unanimous.

1.     Did the prosecution prove beyond a reasonable doubt that the Defendant did not commit any offense in Count 1 and Count 2 as part of a continuing and uninterrupted course of conduct?

Yes _____
No _____

2.     Did the prosecution prove beyond a reasonable doubt that the Defendant committed any offense in Count 1 and Count 2 with separate and distinct intents, rather than acting with one intention, one general impulse, and one plan to commit both offenses?

Yes _____
No _____

In support of the requests, Hardoby cited Hawaii Revised Statutes (**HRS**) § 701-109(1)(e) (2014), which provided:

(1)  When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element.  The defendant may not, however, be convicted of more than one offense if:

. . . .

(e)   The offense is defined as a continuing
      course of conduct and the defendant's
      course of conduct was uninterrupted,
      unless the law provides that specific
      periods of conduct constitute separate
      offenses.

In State v. Hoopii, 68 Haw. 246, 710 P.2d 1193 (1985),
the defendant was charged with kidnapping, raping, and sodomizing
a 6-year-old girl.

> According to the evidence adduced at trial, [Hoopii]
> abducted the girl as she walked home from school.  He first
> drove her to a beach area off of Lagoon Drive, then to
> another unknown location, and then back to the original
> beach area.  At some point, he tied the girl's wrists and
> ankles with rope and covered her mouth and eyes with tape.
> He later untied her, removed her clothing and raped and
> sodomized her.

Id. at 247, 710 P.2d at 1194.  Hoopii moved to dismiss the
kidnapping count pursuant to HRS § 701-109.  The trial court
denied the motion.  The jury found Hoopii guilty as charged, and
he appealed.  The Hawai'i Supreme Court held:

> HRS § 701-109(1)(e) prohibits multiple convictions where the
> defendant's actions constitute an uninterrupted, continuing
> course of conduct.  This prohibition, however, does not
> apply where these actions constitute separate offenses under
> the law.  Furthermore,
>
> > where a defendant in the context of one criminal
> > scheme or transaction commits several acts
> > independently violative of one or more statutes, he
> > may be punished for all of them if charges are
> > properly consolidated by the State in one trial.

Id. at 251, 710 P.2d at 1197 (footnote and citations omitted).
Hoopii could be convicted for kidnapping because he abducted the
girl, whether or not he also raped or sodomized her.  Hoopii
could be convicted for rape or sodomy, even if he had not
kidnapped the girl.  In denying Hardoby's requested jury
instruction and interrogatory in this case, the circuit court
employed a similar analysis:

> THE COURT:  Yeah, these are -- this has always been --
> the most classic example is burglary and assault three.  And
> you know what I'm talking about.  Where the guy goes in the
> house, beats up somebody else.  They charge him with assault

three for beating him up. They charge him with burglary for entering the house.

Merger is when you can not commit one without committing the other. That's the simple way to understand it.

. . . .

THE COURT: So if there are additional elements in one that aren't in the other, then they're separate. So you can commit one assault three inside or outside of a house. But you can only commit a burglary by going inside the house.

Every burglary -- well, I shouldn't say every one, but most every burglary comes with an underlying offense because it's to commit an act inside. I mean unless the actual act is the trespass.

. . . .

THE COURT: But, no, it makes the burglary to go and commit a crime therein, as opposed to just trespassing in somebody's house where you do not actually take anything. You're just walking in without permission.

. . . .

THE COURT: [Hardoby] obviously could have committed the UMV -- I mean the felony abuse outside the car.

. . . .

THE COURT: [CW] didn't have to be in the car for him to complete the act of felony abuse. The felony abuse could have been done in or out of the car.

. . . .

THE COURT: But I don't find that these are one offense. I mean I definitely think they're separate offenses. Separate elements. Distinct elements. That -- that exist in one and not in the other.

We conclude that the circuit court did not err in its analysis. Hardoby was charged with first degree unauthorized entry into a motor vehicle and with felony abuse of a family or household member. HRS § 708-836.5 (2014) provides, in relevant part:

A person commits the offense of unauthorized entry into motor vehicle in the first degree if the person intentionally or knowingly enters or remains unlawfully in a motor vehicle, without being invited, licensed, or otherwise authorized to enter or remain within the vehicle, with the intent to commit a crime against a person or against property rights.

10

HRS § 709-906 (2014) provides, in relevant part:

> (1)   It shall be unlawful for any person . . . to physically abuse a family or household member[.]
>
> . . . .
>
> (8)   Where the physical abuse consists of intentionally or knowingly impeding the normal breathing or circulation of the blood of the family or household member by applying pressure on the throat or the neck, abuse of a family or household member is a class C felony.

Hardoby did not have to actually strangle CW to be convicted of unauthorized entry into her motor vehicle; the criminal act is entry with intent to commit a crime.  Hardoby need not have entered CW's vehicle to be convicted of abuse of a family or household member; the criminal act is the strangulation of CW whether the act was committed in CW's vehicle, in the Foodland parking lot, at the beach park, or somewhere else.  The circuit court did not err in refusing to give the requested jury instruction and interrogatory.

## III.

For the foregoing reasons, the Judgment entered by the circuit court on September 14, 2018, is affirmed.

DATED: Honolulu, Hawai'i, November 22, 2019.

On the briefs:

Benjamin E. Lowenthal,
for Defendant-Appellant.

Peter A. Hanano,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge